## NEW JERSEY FIDELITY & PLATE GLASS INS CO v PEAR

Ohio Appeals, 7th Dist, Mahoning Co

Decided March 4, 1932

William E. Pfau, Youngstown, for plaintiff in error.

Clyde W. Osborne, Youngstown, for defendant in error.

FARR, J

The facts incident to a proper understanding of the issues involved are, briefly, as follows: Abraham Pear is a merchant in the city of Youngstown. His son, Max, was employed by him at the time the burglary occurred at his place of business, on the 25th day of September, 1930. Prior to that time he had solicited and obtained the policy of insurance in question. Pear was in the habit of cashing checks for the employes of the Sheet & Tube Company and his store was located on West Federal Street. There were regular pay days at the mill and Pear was in the habit of securing a sufficient amount of money on a payday to cash the checks of such workmen as would apply to him for that purpose. He did not receive, so it is said, any compensation for cashing these checks, aside from the benefit which it probably was to his business. On the morning of the 25th of September, 1930, that being "pay-day," he claims to have borrowed from his daughter, Mrs. Jack Gordon, the sum of five hundred dollars. He opened the store about seven o'clock on that morning, he says, and out of the money acquired from the daughter some checks had already been cashed, in the amount of about $121.25, and about nine o'clock he sent his son, Max, to the branch

Dollar Savings & Trust Company, situated in that locality, with a note for five hundred dollars. The note was accepted by the bank and the money advanced for the note. This, together with the amount of money obtained from the daughter, would aggregate the sum of $1,000. The payment of employes at the mill perhaps occurred some time a little later. Abraham Pear went to his lunch. He left Max Pear in the store. The hold-up men arrived and it would seem to suggest naturally to the mind that probably they must have known that this was pay-day at the mill, and they must have known also that Pear prepared himself to cash these checks upon this day. At any rate, they called at an opportune time. They tied Max Pear up and proceeded to help themselves to the valuables about the place, which it is claimed included this $1,000 which had been provided, so it is said, for the purpose of cashing the checks. The insurance policy carried a provision similar to that which is known as the "iron safe" clause in fire insurance, and the clause in question reads as follows:

"That the company shall not be liable for any loss:

4. Unless books and accounts and daily tally of money are kept by the assured and are kept in such a manner that the actual loss may be accurately determined therefrom."

The purpose of this provision was to enable the Insurance Company to determine from the books accurately the amount of loss, if any, that would be sustained at the time of a "hold-up." This does not appear to have been the situation in the instant case; that is to say, it does not appear from the record that such books were kept at that time by Abraham Pear. Some books are attached to the record, some stubs of checks, bank deposit book, perhaps offered for the purpose of showing that Abraham Pear kept accounts for his store, but the real vital issue in this case is whether or not under all the circumstances of this case the failure to have a book upon this date in which the entries of these cash amounts had been made was excusable or inexcusable. If inexcusable, then the policy would be void in that behalf, but if excusable the policy would be effective. The real purpose of this policy of insurance was to indemnify Abraham Pear against loss from robbery or burglary. Abraham Pear had probably done on this day that which he had been in the habit of doing for some time. He had se-

cured funds sufficient to cash these checks| The work of cashing them had been begun. So far as the merits of this case is concerned, it does not matter so much what kind of books had been kept in the past, because the issue specifically relates to the books that were kept upon this particular day. These funds were not the current funds of the business. They were not such as would be deposited in the bank and checked out. They were kept ready in the store for the cashing of checks, which was a legitimate business so far as Abraham Pear was concerned. As before stated, no profit was expected to be made, so it is said, aside from the business attracted to the store, but at noon these sums of money had been acquired and the cashing of checks begun. The policy does not require that the entry be made in the books of the business at any particular time. Abraham Pear might reasonably be said to have had all of that day in which to have made entries of the cash received upon that day. Perhaps at the close of business is the customary time for persons so engaged, to balance up or make entries for the day in books, but the unforseen happened and the "hold-up men" came about noon. The day was only half gone. It is not believed that under the circumstances a situation was created that was contemplated by this paragraph in the policy of insurance. There isn't any dispute but what there was $1,000 on hand at that time; that is to say, the daughter testified that she had loaned her father $500.00 to help him out at this time, not an unusual thing if the daughter had the money. Probably he would prefer to incur indebtedness to the daughter rather than to the Bank. Therefore, he secured $500 from the bank to increase the sum, and then Cornell comes from the Bank and says "Yes, I received the note. I paid the cash on it," so that Abraham Pear and Max Pear are corroborated in their statements as to that $500. But, it is said that oral testimony could not be received to determine the amount of cash on hand as a substitute for the books which were provided in the policy to be kept, and the case of Mandelthord et v Union Indemnity Co., 167 NE, 480, is cited. The third proposition of the syllabi reads:

"Oral testimony of insured could not take place of books and accounts required by robbery and burglary policy provision; that company should not be liable for loss unless books and accounts are kept by assured and loss can be accurately determined therefrom."

This court is not in accord with the principle so announced. Suppose, for instance, the hold-up men had taken the books away from Abraham Pear's place, besides whatever cash they obtained, could it then be said that oral testimony could not have been offered to prove how much money was on hand at that time, or, perhaps, to take another view, the hold-up men to complete their work had fired the building and books been burned. Could it then be said that oral testimony could not be received to prove the amount of money on hand? After all, it is a question of proof as to what money was taken and what the jury would believe had been taken in this case from the testimony of Abraham Pear and Max Pear and the daughter and the banker. If the Pears were standing alone in this matter, if it was only the Pears' testimony as to the amount of money that had been taken, there might be some reason to doubt the testimony, stimulated by personal interest, but the Pears are rather considerably corroborated. Hardly can it be said that the banker would have had any ulterior motive in saying anything that would not be true or fair, even though Abraham Pear was his customer, but here was the note that had been given and the money paid on it; likewise the daughter's story is not disputed by any one. Therefore, the conclusion is that the principle announced in 3 Cooley's Briefs on Insurance, §2828, is the proper principle to be applied in this case, where it is said:

"But, in view of Code, Iowa 1897, §1743, relating to the effect of the breach of condition, where such breach does not contribute to the loss, it was held in Marsh v Federal Surety Co., 195 Iowa, 1193, 193 N.W., 563, that a failure to keep proper books of account would not relieve the insurer from liability under a burglary policy, unless such failure contributes to the loss."

And that is the correct principle. If the failure to keep books in this case had contributed to the loss a different view might be entertained, but in the light of the oral testimony, which is clearly to the effect that this money was on hand, and that is somewhat corroborated by the fact that Abraham Pear had for quite some time on paydays provided an additional sum to cash checks. All these things indicate that these witnesses were probably telling the truth as they believed it to be. That was the question that went to the jury, the question of who was right as to the amount of money that was lost by this "hold-up," and whether it was covered by the insurance, and the books had not been kept in strict conformity to the provision in the insurance policy. What difference would it have made if books had been produced showing these two entries of $500.00 each on this day and some one had taken the stand and testified that they were the regular books of the company, etc. If Abraham Pear had desired to substitute a set of books, how readily could it have been done, but he elected to stand upon the facts as he asserted them to be.

Therefore, the proper conclusion was reached in this case and the judgment is affirmed.

ROBERTS and POLLOCK, JJ, concur.